WILLIAM R. HAMMOND et al., Trading as HAM-
MOND, SNYDER & CO. *vs.* AMERICAN EXPRESS
COMPANY.

*Bills and Notes—Bill of Lading Attached to Draft—Maturity of Draft
not Accelerated by Drawee's Option to Pay Earlier on Arrival of
Goods—Declaration in Action by Holder of Bill of Exchange
Against Endorser—Evidence of Usage Inadmissible to Vary Terms
of Draft—Presumption as to Law of England—Allowance of Coun-
sel Fees.*

When a bill of lading is attached to a draft on the consignee, as collateral
security for payment, the time of payment fixed by the draft cannot be
altered by the language of the bill of lading.

When under the terms of a bill of exchange, to which a bill of lading for
the goods is attached as collateral security, the drawee or acceptor has
the option of paying the draft with a discount before the time fixed for
payment by it, the bill does not mature before such time, by reason of
the prior arrival of the goods, so as to make it necessary for the holder
to present the draft for payment then.

Defendants endorsed to plaintiff a bill of exchange on a firm in Dublin,
payable sixty days after sight, on account of a shipment of wheat.
Attached to this draft was a bill of lading for the wheat. On the face of
the draft were these words, "to be surrendered upon payment of this bill
before maturity under discount on or before arrival of vessel." The
drawee wrote on the draft, " accepted from November 5, 1906," but the
bill of lading was retained by the plaintiff. The grain arrived in Dublin
November 28th. The draft was not paid upon the expiration of the
sixty days, and notice of presentment and dishonor at that time was
given to the defendants. The wheat was sold by the plaintiff for less
than the amount of the draft and this action was instituted to recover
the deficiency. Defendants' special pleas alleged that by the terms of
the draft and the bill of lading, the maturity of the draft was accelerated
by the arrival of the grain before the expiration of the period named in
the draft for its payment ; that it was the duty of the plaintiff to present
it for payment on the arrival of the vessel, and that since this was not
done, the defendants were discharged ; also, that by a usage in the
export grain trade, known to the plaintiff, such drafts are payable either
upon the expiration of the time limit or upon the arrival of the vessel,
whichever shall first occur. *Held,* that the draft was the primary obli-
gation to which the bill of lading was attached as collateral security for
payment ; that the bill of lading could not modify the terms of the draft

and was not to be surrendered until payment; that the memorandum on the draft cannot be construed to accelerate the maturity of the draft, but only to authorize its payment before maturity and to notify the holder that in that event there would be a discount, and that consequently, the plaintiff was not bound to present the draft for payment upon the arrival of the vessel.

*Held*, further, that the terms of the contract of sale of the wheat cannot be imported into the draft so as to modify its language merely because the bill of lading for the wheat was attached to the draft.

*Held*, further, that the alleged usage cannot be allowed to fix a different time for the maturity of the draft from that plainly apparent upon its face, which was sixty days after acceptance.

A declaration states a good cause of action when it alleges that the defendants by their draft on H. & Co., directed them to pay to their order a certain sum; that the defendants endorsed to the plaintiff, the draft with the bill of lading thereto attached; that the draft was duly presented and accepted by H. & Co., and dishonored, and that due notice thereof was given to the defendants, that the sale of the goods covered by the bill of lading was insufficient to pay the draft in full.

When a bill of exchange is drawn in Maryland on a drawee in Dublin, who accepted it as payable in London, the time and mode of payment is governed by the law of England.

In the absence of any evidence to the contrary, it will be presumed that the law of England relating to the presentment and payment of bills of exchange is the same as that of Maryland.

When the defendant disputes plaintiff's demand as a matter of law and not of fact, and after a demurrer to the plea has been overruled allows judgment to go against him by default for want of a good plea, there has been such a "trial of the case" as authorizes the Court to allow the plaintiff a counsel fee under the Act of 1890, chap. 443, which provides that in certain specified cases when the defendant disputes the plaintiff's demand and on the trial of the case the plaintiff recovers a judgment, then he shall be allowed reasonable counsel fees to be fixed by the Court.

*Decided January 8th, 1908.*

Appeal from the Baltimore City Court (STOCKBRIDGE, J.)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER BURKE and WORTHINGTON, JJ.

*Charles W. Heuisler* and *E. Allan Sauerwein, Jr.*, for the appellants.

The ground of the appellant's demurrer to the declaration is that the bills were payable upon the arrival of the vessel, with grace, should the vessel arrive before the expiration of sixty days from the date of acceptance; and if not, then at sixty days from the date of acceptance; and, since the declaration, shows that the vessel arrived on the 28th day of November, 1906—just twenty-three days after the acceptance—the bill matured at such time and should have been presented for payment three days thereafter, to-wit: on the first day of December, 1906; and that the failure to so present the same and the holding of the same until the seventh day of January, 1907, was a failure to duly present the same for payment, which worked a discharge of the appellants as endorser.

From an examination of the bills in suit they may be payable "sixty days after sight," or "upon arrival of vessel," or both, and the question is which?

By entirely ignoring the clause ("to be surrendered upon payment of this bill before maturity under discount on or before arrival of vessel"), we have a plain negotiable sixty days after sight bill; but the rule of construction requires that one part must not be construed to the exclusion of the other; but "must be construed with reference to the other that the whole may, if possible, stand, and, if it can be prevented, no clause, sentence or word shall be superfluous, void or insignificant," and this rule, says the Court, is as applicable in the interpretation of commercial paper as in the interpretation of statutes. *MacCarty* v. *Howell*, 24 Ill. 341; *Jones* v. *Fales*, 4 Mass. 245, 253. And for illustration of the application of this rule see *Cota* v. *Buck*, 7 Metc. 588; *Ernst* v. *Steckmann*, 74 Pa. St. 13.

The language to be construed in the light of this rule suggests but two possible constructions to the contending parties, and we may safely assume that none other are possible.

First, the construction put upon them by the appellee—that they are bills payable sixty days after sight, with the *option* to

the acceptor to take them up on or before the arrival of the vessel. This interpretation infringes the rule of construction given above in that the clause "to be surrendered, etc." is relegated to the position of an instruction to the holder to accept payment before it is due—a right which the holder has without such instruction—and is therefore treated by the appellee as superfluous.

It is also an unnatural and unreasonable interpretation, in that the acceptor is limited to the right to anticipate the maturity of the paper up to the arrival of the vessel; whereas, in the ordinary course of events, the unexpired time postdating the arrival would greatly exceed the unexpired time antedating it. As such an instruction, it would be of no possible benefit or advantage to the drawer and would be meaningless to the endorsee.

On the other hand the construction contended for by the appellants, to wit:—that they are bills payable on the arrival of the vessel provided it arrives within sixty days after acceptance ; or should the vessel not so arrive, then at sixty days after sight, with the option to the acceptor to take them up before the arrival of the vessel, is within the rule in that it gives to every word its full and ordinary meaning and is both reasonable and probable.

Another useful purpose of the sixty-day clause and one thoroughly consistent with the interpretation contended for by the appellants is that it forms a basis from which to compute the unexpired period of the bill *for purposes of discount*; for it will be observed that the clause provides that the acceptor is entitled to discount for the unexpired time between the date of the arrival and the sixty days computed from the date of acceptance.

This view is further strengthened when we reflect upon the history of foreign grain bills. The grain was usually sold on a cash basis, and so it became necessary to establish a period of time within which the grain could safely be assumed to arrive, and this was made sixty days ; so that sixty days after sight became the stereotyped form for all foreign grain bills ;

but since in many, if not in most, instances a much less period of time would be required, the acceptor was to be allowed discount for the unexpired time should the grain arrive within the period of sixty days, and he is thereby required to pay for the same at a date ealier than that at which the selling price had been computed.

Such provisions providing for the acceleration of the maturity of the bills admitted do not destroy their negotiability. *Carlin* v. *Knealey*, 12 M. & W. 139; *Ernst* v. *Steckmann*, 74 Pa. St. 13.

But the point was made below, that, " while words accelerating the maturity do not destroy the negotiability, yet, *for all purposes of negotiation* the paper will be regarded as payable on the day named therein," and the case of *Jordan* v. *Tate*, 19 Ohio St. 586, was cited in support of this doctrine. But the Jordan case, as reported, merely states the proposition as above without any description of the instrument in suit ; without any statement of the facts of the case and with no briefs of counsel or reasoning of the Court ; and thus, standing alone, could be safely ignored were it not for the fact that the case is cited with apparent approval in the case of *Ernst* v. *Steckmann* 74 Pa. St. 13, which is relied upon by the appellants. The Court in *Ernst* v. *Steckmann*, however, also cites with approval the case of *Carlin* v. *Knealey*, 12 M. & W. 139, which reasons to the contrary of the conclusion in the Jordan case, and it therefore becomes necessary to harmonize or differentiate these two cases cited in the Pennsylvania case.

*Ernst* v. *Steckmann* was a suit upon a promissory note payable " twelve months after date or before if made out of the sale of a (named) machine." The suit was by an endorsee in his own name and the defense was the non-negotiability of the paper. The question before the Court was not to ascertain the due date but to determine whether or not the negotiability was destroyed, and the Court very properly cited both the Jordon and Carlin cases as holding the paper negotiable, notwithstanding the provisions for acceleration : and to that extent the cases do harmonize. But we can also differentiate them.

The case of *Carlin* v. *Knealey* was a suit by the holder against the endorser upon a series of installment notes, each containing a clause providing for the maturity of all upon the default of any one.    Now, here you have as cause of acceleration the happening of an event indicated in the instrument itself, resulting from the non-performance of the obligation, and the happening or not happening of which is known equally well to the holder as to the payor, and, although the rights of the parties incident to negotiation were here involved, the Court held the instruments negotiable, and all unpaid notes to mature upon the first default, and that it was the duty of the holder to present the same within a reasonable time after such default.    This case represents one type of negotiable instrument providing for accelerated maturity.    But there is yet another class of cases, to-wit, where the acceleration is made to depend upon the whim of the payor—such as, for example, "on or before," "within one year," "three years, reserving the right to pay before," etc.    *Mattison* v. *Marks*, 31 Mich. 421; *Moore* v. *Horsley*, 42 Ark. 163; *Leader* v. *Plante*, 95 Me. 339; *Riker* v. *Sprague*, 14 R. I. 402.

Since we do not know the nature of the instrument in suit in the case of *Jordan* v. *Tate;* and since the Court in *Ernst* v. *Steckmann* cites with approval both that case and the case of Carlin v. Knealy without making note of the apparent conflict as to maturity; and, since the Court was not asked to, and did not find the maturity of the paper in suit; we may safely assume that the Jordan case belongs rather to that class of cases of which the Mattison, Moore, Leader and Riker cases are types as contra-distinguished from that class of cases of which the Carlin case is a type.

To paraphrase the distinction thus drawn is to say that where the due date is accelerated by extraneous circumstances equally accessible to the holder as well as the payor and not dependent upon the whim of the payor, then the due date, *even for purposes of negotiation*, will be the accellerated date if it occur within the certain date named therein.

Therefore, in the light of these cases, the bills may be con-

strued as payable upon the arrival of the vessel, provided the vessel arrives within sixty days after acceptance, with discount for the unexpired time, thereby putting upon the holder the duty to present for payment upon the arrival of the vessel.

But the phrase does not read "to be surrendered on the arrival, etc.," but "on or before the arrival, etc." The use of the words "on or before" in the clause under discussion however, need cause no concern since they are held to mean "on, with the option to the payor to retire the instrument before maturity:" *Mattison* v. *Marks*, 31 Mich. 421; *Moore* v. *Horsley*, 42 Ark. 163; *Leader* v. *Plante*, 95 Me. 339; *Walker* v. *Woolen*, 54 Ind. 164, and cases cited; 7 *Cyc.* 844, note 52; *Story's Promissory Notes*, section 28, and in the light of the Jordan case this option is to be ignored by the holder, and, for purposes of negotiation, the instrument is to be treated as payable "on."

It was urged below that such a construction as that contended for by the appellants would put upon the dealers in foreign bills of exchange the duty of watching the arrivals of vessels, that presentation may, after three days of grace, be made, and that such a resort would work a great inconvenience and hardship upon the bankers. This in itself, however, affords no legitimate excuse or reason for finding a different construction. *Bank of Columbia* v. *Fitzhugh*, 1 H. & G. 239; *Creteau* v. *Foote & Thorne*, 40 App. Div. 215. These bills in addition to being sixty day sight bills contained the clause "to be surrendered upon payment   *   *   *   before maturity under discount on or before arrival of vessel." Should this language in itself not be held to be ambiguous, uncertain or technical, it then becomes the province of pleas to allege extraneous facts and circumstances to make the language technical, ambiguous and uncertain before setting up a usage by which it is purposed to construe that language. Therefore, it is that all of the pleas begin with the recital that the bills were drawn under a contract of sale existing between the appellants—the drawers and Arthur Hughes & Co.—the acceptors; that that contract contained the following payment

clause: "payment by cash in London in exchange for shipping documents on or before the arrival of the vessel, less discount at the rate of one-half of one per cent per annum above the advertised rate of interest for short deposits allowed by the leading joint stock banks in London for the unexpired time of sixty days from the arrival of bill or bills of lading in London or at seller's option by buyer's acceptance of shipper's drafts domiciled in London at sixty days from date of arrival of bill or bills of lading in London with documents attached as usual, but payment in no case later than the prompt."

The pleas also recite that the clause respecting the surrender of the documents was copied from the aforegoing provision of the contract of sale and was inserted with the intention of making the bills payable upon the arrival of the vessel provided it arrived within sixty days from the date of the acceptance in accordance with the terms of the said contract of sale. These provisions, it is urged by the appellants, are sufficient for the introduction of a usage if the usage measure up to the legal requirements irrespective of any basis which the bills of exchange might of themselves afford, and here the pleas diverge.

The third plea alleges a universal custom charging that such contracts of sale containing such clauses are universally used in the export of grain to the United Kingdom; that under such contracts of sale it has been the custom for purchasers of American grain to take up the documents and the bills on the arrival of the vessel with grace, provided the vessel arrives within sixty days from the date of the acceptance; that the appellee has for a long time anterior to the purchase of the bills in suit, been engaged in the purchase of similar foreign bills containing similar clauses; and that the appellee had, or by reason of such business experience, should have had full knowledge of the existence of the said clause in the contract, and of the usage with respect to the maturity of bills of exchange drawn under such contracts.

It is urged that since the record shows judgment was obtained by the appellee *not upon trial*, but by default for want

of sufficient pleas, it is not such a case as falls within the provision of the Act of 1890, and it was error, therefore, to award counsel fees therein.

*John Philip Hill*, for the appellee.

The clause in the bill relating to its payment before maturity indicates the "particular account to be debited," and allows the drawee an option to obtain the bills of lading and other shipping documents relating to the grain by paying the bills of exchange before maturity. It has nothing to do with fixing the date of this maturity to which it refers, yet by their construction of this clause the appellants seek to change the date of the maturity of the bill and it is *on this clause alone* that the appellants seek to avoid their responsibility. It is claimed by them that this clause is a part of the unconditional order to pay, and that the bills of exchange instead of being payable sixty days after sight, with an option of payment before maturity, are payable *on the arrival of the vessel* or at sixty days after sight, whichever event shall first happen, with an option to the acceptors to take the same up under discount before the arrival of the vessel.

The appellants thus attempt to make a double use of the clause providing for surrender of documents "upon payment of this bill before maturity under discount on or before arrival of vessel." They claim that in addition to giving an option of payment before maturity, these words make the bills of exchange mature on the arrival of the vessel, so that if the holder of the bills does not present them for payment upon such arrival with three days grace, he loses all rights against the drawers and endorsers. The Negotiable Instruments Acts and the whole law on commercial paper is designed to secure certainty, so that bills of exchange and promissory notes will readily pass current. If the appellants' contention should be adopted a blow would be dealt to the very fabric of foreign credits and exchange, for no banker would take a bill of exchange whose date of maturity and the consequent presentation for payment depended upon the uncertain arrival of a grain ship.

The appellants contend that the bills are payable on the arrival of the vessel or at sixty days after sight, whichever event shall first happen. They called this "an alternative maturity." LORD CAMPBELL, C. J., the eminent commercial jurist, has settled the law in England upon this contention, in the case of *Alexander* v. *Thomas*, 16 Q. B. 333, in which it was held that an order for a sum "payable ninety days after sight, or when realized," is not a bill of exchange. The same contention was made in that case as the appellants make in this, for it was claimed in that case that "the meaning of the bill of exchange as described in the declaration is that it is to be paid ninety days after sight at all events, or sooner if the drawee is in funds before that period." In answer to this LORD CAMPBELL said: "I think this would not be a good bill, for the holder would have to watch and ascertain the precise time when the bill should become payable, and if he failed in doing this, and in duly presenting it, the drawer would be discharged."

 The bills of exchange were drawn in Baltimore but payment was to be made in England, and so English law governs. *Daniel on Negotiable Instruments*, sec. 7. It is submitted that LORD CAMPBELL'S decision is conclusive against the appellant's contention.

In some American cases it has been held that an order similar to that in *Alexander* v. *Thomas*, in a bill or note did not destroy its character as a negotiable instrument, but even in such cases it has been expressly stated that there could be but one date upon which it was the duty of the holder to present the bill of exchange for payment.

 In *Mattison* v. *Marks*, 31 Mich. 421, JUDGE COOLEY, speaking of a note payable "*on or before*" a date named, said: "It seems to us that this note is payable at a certain time. It is payable certainly, and at all events, on a day particularly named; at that time; and not before, payment might be enforced against the maker. It is impossible to say that this paper makes the payment subject to any contingency or puts it upon any condition. The legal rights of the holder are clear

and certain; the note is due at a time fixed, and it is not due before.   True the maker may pay sooner if he shall choose, but this option, if exercised, would be a payment in advance of the legal liability to pay, and nothing more." JUDGE COOLEY's opinion was·quoted with approval in *Leader* v.*Plante,* 95 Me. 339.   In *Moore* v. *Horsley,* 42 Ark. 163, it was decided that "An action on a note payable on or before a paticular day can not be brought till after that day."

Messrs. Arthur Hughes & Company accepted the bills of exchange drawn by the appellants without any qualification and thereupon the date of the maturity of the instruments became fixed.   The legal rights of the holder, the American Express Company, are clear and certain; the bills were due sixty days after acceptance with grace, and were not due before.

True, the bills of lading and other documents were "to be surrendered upon payment of the bills before maturity under discount on or before arrival of vessel," but, still following the wording of JUDGE COOLEY's opinion, this option, if exercised, would be a payment in advance of the legal liability to pay, and nothing more.

Each of the four special pleas, though differing slightly, alleges that the bills of exchange were the means employed by the appellants to collect of Arthur Hughes & Co. the purchase -price of the grain represented by the bills of lading, quotes from the contract between appellants and Arthur Hughes & Co. and deduces therefrom an alleged custom by which these bills were to be taken up on the arrival of the vessel bearing the grain.   The theory of the pleas seems to be that either the appellee is bound by the contract between the appellants as vendors of grain and their vendees, Arthur Hughes & Co., or else that the bills of exchange are affected by some mercantile custom which changes the date of their maturity.   It is submitted that neither the contract between the appellants and their vendees, nor the alleged custom, have any such effect as that claimed, and it is further submitted

that even if the pleas showed such a contract or custom, that the rights of the appellee were not affected by either.

The rights of the appellee are not affected by the contract, for it is settled that the endorsement of a bill of exchange with its collateral bill of lading does not operate as a sale to the indorsee of the grain represented by the bill of lading and to be paid for by the bill of exchange, nor does it substitute the holder of the bills for the vendor of the grain. *German-American Bank* v. *Craig*, 96 N. W. 1023; *Blaisdell* v. *Citizens National Bank*, 75 S. W. 292.

The custom alleged in the pleas is repugnant to the unqualified order of payment of the bills of exchange *Denton* v. *Gill and Fisher*, 102 Md. 407. Note in 3 L. R. A. N. S. 248.

SCHMUCKER, J., delivered the opinion of the Court.

This suit was instituted in the Baltimore City Court under the Rule Day Act by the appellee company against the appellant firm to recover alleged balances due on two foreign drafts or bills of exchange drawn by them. The two drafts are similar in form and for like amounts and they were both drawn on Arthur Hughes & Co. of Dublin against a consignment of wheat shipped by the Lord Dufferin and to each draft was attached an order bill of lading for 8,000 bushels of the wheat. The drafts were in the following form:

"Sixty days after sight of this First Exchange (Second of the same tenor and date unpaid) pay to the Order of Ourselves Thirteen hundred and seventy-three Pounds % sterling.

Value received and charge the same to account of Dcmts 8000 bus. wheat to be surrendered upon payment of this Bill before Lord maturity under discount on or before arrival of Dufferin vessel.

To Messrs. Arthur Hughes & Co.,
            Dublin.          Hammond, Snyder & Co."

The drafts with the documents attached were sold and endorsed by the appellants to the appellee and were by it on November 5th, 1906, duly presented for acceptance to the

drawees who accepted them in writing across the face of each draft the words "accepted from Nov. 5th, 1906. Payable at Lloyds Bank London, Arthur Hughes & Co." The grain arrived at Dublin on November 28th, 1906. The bills of lading attached to the drafts were not delivered to Hughes & Co. on the acceptance by them of the drafts but were retained by the appellee until the expiration of 60 days and three days of grace and were then presented for payment to Lloyd's Bank in London and were dishonored, of which their makers, the appellants, had due notice. The appellee then sold the grain represented by the bills of lading and, the net proceeds not proving sufficient to pay the drafts, it instituted the present suit to recover the deficiency.

The appellants as defendants below demurred to the *nar.* and their demurrer having been overruled they filed four pleas with appropriate affidavits of defense and certificates of counsel. The first and second pleas presented the general issue. The third plea alleged by way of equitable defense that the drafts sued on were the means employed by the defendants to collect from Arthur Hughes & Co. the price of grain sold to them under a contract, of the form of the London Corn Trade Association, which contained a clause requiring the grain to be paid for on or before the arrival of the vessel subject to discount, or at the seller's option by buyer's acceptance of shipper's drafts at sixty days from the date of arrival in London of the drafts with documents attached. That under such contracts it had long been the custom of the trade for buyers of American grain to take up the drafts with the accompaying documents on the arrival of the vessel with grace, if it arrived within sixty days from the date of acceptance. That the plaintiff, having in the course of its business long been a purchaser of foreign drafts many of them drawn under contracts containing clauses such as that set out in the plea, knew or ought to have known of the said usage as to the maturity of the drafts and ought therefore to have presented them for payment on the arrival of the vessel with grace but it failed to do so and held them until sixty days after their acceptance with grace and only then presented them for payment.

The fourth plea differed from the third in that it averred that by virtue of the presence on the face of the drafts of the memorandum there appearing, which was taken from the form of contract of the London Corn Trade Association, the appellee knew that the drafts matured on the arrival of the vessel with grace and it should have presented them for payment at that time, but it failed to do so.

The plaintiff joined issue on the first two pleas and demurred to the last two and the Court sustained its demurrer. The defendants then filed their fifth and sixth pleas also by way of equitable defense. The fifth plea differs from the third in averring that the plaintiff knew that other bills of exchange drawn by the defendant in similar form matured and were retired on the arrival of the vessel with grace and that the plaintiff knew that it was its duty to so present these drafts for payment but failed to present them until the expiration of sixty days from their acceptance. The sixth plea differs from the fourth in averring that, by a usage covering more than fifteen years between the defendants, and the firm of Smith, Hammond & Co. who were their predecessors in business and those with whom they dealt in the corn trade, their drafts against shipments of grain had been uniformly drawn in the same form as those sued on in this case and had been retired upon the arrival of the grain at its port of destination with grace, provided the vessel arrived within the period named in the bills, and that the plaintiff by reason of its dealing in such drafts should have had full knowledge of the usage, but it failed to present the drafts for payment on the arrival of the vessel with grace in accordance with the usage. These special pleas were rather long ones but we have stated their substance.

The plaintiff demurred to the fifth and sixth pleas and the Court sustained the demurrer. The defendants thereupon withdrew their first and second pleas and the plaintiff took judgment against them by default for want of pleas and affidavit of defense and, the judgment having been extended, the defendants took the present appeal.

There was no error in overruling the demurrer to the declaration which on its face presented a good cause of action. It averred in proper detail, in reference to each draft, that the defendants thereby directed Arthur Hughes & Co. to pay to their order the amount therein stated and that the defendants endorsed to the plaintiff the draft with the bill of lading thereto attached, and then averred the presentation, acceptance and subsequent dishonor of the draft, and the due notice thereof to the defendants, the sale of the grain covered by the bill of lading and the failure of the net proceeds of the sale to pay the draft in full.    Those facts if duly proven would have justified a verdict in favor of the plaintiff for the amount of the deficiency shown by the evidence.

The special pleas reveal the true theory upon which the appellants sought to defend the suit.    That theory briefly stated was that by the terms of the contract for the sale of the grain, or the usage of the trade in the course of which the sale was made, the maturity of the drafts drawn against the proceeds of the grain was so accelerated that they became payable on the arrival at its destination of the vessel with the grain on board, if it arrived, as it in fact did, before the expiration of the period named in the draft itself for its payment.  The theory further assumed that the appellee was so affected with knowledge of the terms of the said contract of sale or usage of the grain trade, by the fact of its having frequently bought other drafts of like character or by the presence of the memorandum appearing on the face of the drafts in the present case, that it became its duty to present the drafts for payment on the arrival of the vessel and that its failure to do so discharged the defendants as endorsers of the draft from all liability thereon. In other words the pivotal question presented by the appeal is whether the maturity of the drafts in the hands of the appellee was accelerated by the facts alleged in the pleas.    Upon the answer to that question the case must turn.

The question is presented to us by the record in two phases.    They are, whether, by the proper construction of the drafts themselves in their present form, it was the duty of the

appellee to present them for payment on the arrival of the vessel, and, if that be answered in the negative, whether its duty in reference to their presentation for payment was modified by the terms, as alleged in the plea, of the sale of the grain against whose proceeds the drafts were drawn or the usage of the export corn trade.

It is plain that if the words "to be surrendered upon payment of this bill before maturity under discount on or before arrival of vessel" did not appear on the face of the drafts, they would by their own terms fix their maturity at sixty days after sight and their holder would have been under no obligation to present them for payment before that time. Nor should the fact that they were drawn against the proceeds of the wheat and had the bill of lading for it attached to them change the date of maturity fixed by the drafts themselves. This would certainly be true if the bills of lading be regarded as having been attached to the drafts as collateral security. The function of such security is to furnish a guaranty for the performance of the terms of the principal obligation and not to effect a change in those terms, which, remain the same as if no security had been given for their performance. If on the other hand the drafts, in the hands of the appellee as a *bona fide* holder for value, are affected by the fact, alleged in the pleas, that they were the means employed by the appellants to collect the price of the wheat covered by the bills of lading, still the appellants themselves fixed the date when that price should fall due by drawing the drafts at sixty days after sight.

If we turn now to the memorandum appearing on the face of the drafts and inquire into its true significance we find that it simply provides for the surrender of the bills of lading attached to the drafts upon the payment of the latter under discount either on or before the arrival of the vessel. It is obvious from the memorandum, that the bills of lading were not intended to be surrendered until the payment of the drafts, because by its terms the obligation to surrender them is conditioned upon such payment. It cannot be successfully contended that this memorandum, whether it be held to operate

as a condition or an agreement, should be construed to accelerate the *maturity* of the drafts, for by its express terms it relates only to the event of their payment "*before maturity.*" The contents of the memorandum suggest that the purpose of placing it upon the drafts was to warn their holders that they must have the bills of lading ready to surrender and must be prepared to submit to a discount on the drafts if the acceptor desired to exercise the option which it gave him of paying them before maturity.   Admitting the right of the acceptor, in common with other debtors, to prepay his obligations in full, he could not, in the absence of the memorandum on the drafts, have exacted a discount from their face value for their prepayment.

Nor do we think that the terms of the contract of sale of the wheat against whose proceeds the drafts were drawn can be imported into the drafts or held to modify or control their plain language merely because the bills of lading for the wheat were attached to the drafts.   This is quite a different case from that of the *Nat'l Bank of Commerce* v. *Merchants Nat'l Bank*, 91 U. S. 92, which was much relied on in argument before us by the appellants.   In that case the question was whether, when a plain time draft, without any memorandum on its face, had been drawn against a consignment of cotton to order and had been forwarded to an agent for collection with the bill of lading for the cotton attached without any further instructions, it was the duty of the agent to deliver the bill of lading to the drawee of the draft upon its acceptance by him or to hold the bill until the payment of the draft. . It was there held that the agent could not expect the consignee of the cotton to accept the draft for its price unless he was furnished with the bill of lading in order to obtain possession of the cotton.   The Court there held that it was to be inferred from the facts of the case before it that the transfer of the bill of lading to the agent had not been made to secure the payment of the draft.   It was moreover distinctly held in that case that if the owner of the draft had instructed the agent to retain the bill of lading *until the payment* of the draft and he had surrendered it upon the

acceptance of the draft he would have been liable to the owner for a breach of duty.

In the present case not only are we dealing with a *bona fide* owner for value of the drafts, instead of a mere agent for their collection, but it is manifest, both from the nature of the memorandum on the face of the drafts and from the fact that their drawee accepted them without demanding or receiving the bills of lading, that it was the intention of the parties that the appellee should retain the bills of lading until the *payment* of the drafts, in other words, the bills of lading were attached to the drafts as collateral security for their *payment.* Under these circumstances the bills of lading must be regarded as having been attached to and transferred with the drafts to secure the performance of the terms of the latter and their presence should not be held to have the effect of modifying or changing those terms. The drafts were the primary obligations to which the bills of lading were merely incidental and collateral.

Neither do we think the existence, if such there were, of a trade usage or custom of the kind set up in the pleas could be shown to accelerate the maturity of the drafts. By their own terms expressed in plain language the drafts did not mature until the expiration of sixty days after sight *i. e.*, after acceptance. That fixed the date upon which the holder was bound to present them for payment and at which, if they were dishonored, he was to notify the prior parties thereto if he wished to hold them liable on the drafts. The liability of those parties being secondary and contingent upon proper presentation of the drafts and notice of their dishonor it was essential that there should be no uncertainty as to the date of their maturity. To permit a custom or usage to be shown fixing a different maturity from that plainly appearing upon the face of the drafts would be to introduce into the contracts made by the drafts a provision inconsistent with one of the most vital of their express terms. It is well settled that this cannot be done. *Denton* v. *Gill and Fisher*, 102 Md. 407; *Foley* v. *Woodside & Mason*, 6 Md. 49.

The drafts having been drawn in Maryland upon a drawee

residing in Dublin who accepted them payable in London, the English law, as the *lex fori,* would regulate the method of their payment and the matters incident thereto, but in the absence from the record of any allegation that the general propositions of the English law applicable to the subject differ from those in force here, they will be presumed to be the same.   *State* v. *P. & C. R. Co.,* 45 Md. 46; *Dickey* v. *Pocomoke Bank,* 89 Md. 297.

The Court below, acting under the authority conferred by ch. 443, of the Acts of 1890, allowed the plaintiff's attorney a counsel fee of $50.   The provisions of the Act are as follows: "If the defendant shall dispute the whole or any part of the plaintiff's demand in any action brought under the provisions of the three foregoing sections and upon trial of the case the plaintiff shall recover a judgment for any portion of his demand so disputed, then the plaintiff shall be allowed, in addition to the costs of the suit, reasonable counsel fees, to be fixed by the Court; said fees not to be less than $25 nor more than $100."

We see no error in the allowance of this fee.   No issue of fact was made up and heard in the case, it is true, but the real controversy between the parties was disposed of upon the issues of law made by the demurrers which were argued by counsel and determined by the Court.   The fact that at the end of the proceedings the defendants withdrew their pleas and allowed judgment by default to go against them, did not deprive the case of its controversial character.   The defendants disputed the plaintiff's claim and forced its counsel to try the issues arising from the dispute.   It is not material that the pleadings resulted in issues of law upon which the defendants elected to make their final stand in the Court below.   There was in our opinion a "trial of the case" within the meaning of the law.

The judgment appealed from will be affirmed.

*Judgment affirmed with costs.*